**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**EDWARDS FAMILY PARTNERSHIP,**                                       **APPELLANTS**
**LP; BEHER HOLDINGS TRUST; &**
**CHARLES C. EDWARDS**

                                           **CAUSE NO. 3:18-CV-154-CWR-LRA**
**V.**                                              *consolidated with*
                            **3:18-CV-155, 3:18-CV-156, & 3:18-CV-157**

**KRISTINA M. JOHNSON, Trustee for**                              **APPELLEE**
**Community Home Financial Services**
**Corporation**

### MEMORANDUM OPINION AND ORDER

      Edwards Family Partnership, LP, Beher Holdings Trust, and Charles C. Edwards appeal the Bankruptcy Court's memorandum opinion and judgment. For the reasons that follow, the judgment is affirmed in part, reversed in part, and rendered in part.

**I.**      **Factual and Procedural History**

      This case is complex and the proceedings have been lengthy. What follows will discuss only those facts and proceedings necessary to the decision. Readers can find more detail in the Bankruptcy Court's 214-page opinion. That opinion will be cited as "Op. at [page number]."

      Charles C. Edwards is a doctor and investor in Baltimore, Maryland. He owns Edwards Family Partnership, LP and Beher Holdings Trust, among other companies. Between 2006 and 2012, Dr. Edwards' entities invested tens of millions of dollars in Community Home Financial Services (CHFS), a mortgage servicing company in Jackson, Mississippi run by Butch Dickson.

      The relationship fell apart. State-court litigation commenced in 2012 and was removed here. In an attempt to recoup as much of his investment as possible, Dr. Edwards asked this Court to appoint a receiver to manage CHFS's affairs. The undersigned heard evidence at a

multi-day hearing until CHFS filed for bankruptcy and brought the action to a halt. Thus began a six-year saga in the U.S. Bankruptcy Court for the Southern District of Mississippi that has come at enormous cost to all involved. The litigation has lasted longer than the underlying business relationship.

Dr. Edwards filed proofs of claim totaling nearly $30 million. The numbers were not inflated. In the receivership proceeding, Dr. Edwards had sought $30.8 million. *See* Docket No. 16 in No. 3:12-CV-252. In a later proceeding to enforce Dickson's personal guarantee, Dr. Edwards received a judgment against Dickson in excess of $28 million. *See Amended Rule 54(b) Final Judgment* in *Edwards Family P'ship v. Dickson*, No. 3:13-CV-587-CWR-LRA, Docket No. 83 (S.D. Miss. July 25, 2016).

The curious feature of this bankruptcy, given its worth, was in how few claims there were to resolve. Aside from the Edwards entities' claims for roughly $30 million, the Estate of CHFS owed a handful of creditors several thousand dollars each—about $200,000 in aggregate. Op. at 52. It would have been a rational, efficient decision to settle with all of the minor creditors and give Dr. Edwards whatever was left. *See Edwards Family P'ship, LP v. Johnson*, No. 3:18-CV-158-CWR-LRA, 2020 WL 4506788, at *1 (S.D. Miss. Aug. 5, 2020). After all, $200,000 represents less than 1% of the estate.[1]

That did not happen. Instead, Dickson directed CHFS to commence adversary proceedings challenging whether Dr. Edwards' investments were secured or unsecured. *Id.* at *2 (finding this strategic decision "neither necessary nor 'reasonably likely' to benefit the CHFS estate"). It turns out Dickson was a crook. He fled to Central America with millions of dollars.[2]

---

[1] Dr. Edwards' explanation of the status of those claims can be found at Docket No. 32 at 3 & nn.2-4. He says he has now purchased the claims of every owner who can be located. He owns all but $36,500 of the total claims. Docket No. 41 at 4 n.7. If $200,000 represents a handful, then this $36,500 is less than a thumbnail.

[2] On his return, Dickson was convicted of bankruptcy fraud and went to federal prison.

Upon his flight, the first Bankruptcy Judge to preside over this case appointed a Jackson attorney named Kristina Johnson as Trustee to manage CHFS's affairs. The Trustee hired the law firm at which she is a partner, Jones Walker, to be her counsel. She resumed the proceedings challenging the priority of Dr. Edwards' claims and then filed new claims, including RICO claims, against him. Every effort the first Bankruptcy Judge and the undersigned made to encourage settlement failed.[3] Private mediation before Judge Houston, the retired Bankruptcy Judge from Northern Mississippi, was also unsuccessful.

When this Court wrote in earlier proceedings that it had a lot to say about this case, it was about the litigation this dispute has spawned, and how over the last five years that litigation has gotten out of hand.

Trustees and their attorneys are "not private persons" acting out of self-interest, but "officers of the court" with special duties to the judiciary and the creditors. *Matter of Evangeline Ref. Co.*, 890 F.2d 1312, 1323 (5th Cir. 1989) (quotation marks and citations omitted). "The powers and duties of a bankruptcy trustee are extensive." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985). "The trustee is accountable for all property received, and has the duty to maximize the value of the estate." *Id.* at 352 (quotation marks and citations omitted). A Trustee is, in fact, "duty bound to assert" a cause of action "if doing so would maximize the value of the estate." *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 246 (5th Cir. 1988). *If* doing so would maximize the value of the estate.

The Trustee was appointed to bring stability to a bad situation—CHFS's failure and Dickson's fraud—so that remaining funds could be returned to CHFS's creditors. "Creditors"

---

[3] During hearings and trials, this Court routinely encourages parties to resolve their differences at any time before the Court or jury renders judgment. There is no doubt that the Court did so during the multi-day hearing that birthed this case.

here essentially means Dr. Edwards. But something went wrong. The parties dispute who started it and when it happened. Those are complex questions that must be resolved later. At some point, though, the Trustee's priorities shifted from recovering money for the benefit of Dr. Edwards, to pursuing Dr. Edwards.

The structural incentives are obvious and common enough. When a Trustee sues anyone or challenges anything in court, she can bill the estate for services rendered. She is authorized to bill her own hourly fees, the hourly fees of those who represent her (which in this case includes the partners, associates, and paralegals of her law firm), and every other professional she hires. Those fees become the responsibility of the estate. In large cases, a Trustee and her counsel stand to make millions of dollars.

Because of the potential for abuse, and mindful that "every dollar received by the [Trustee] results in one dollar less for creditors." the judiciary requires Trustees and other professionals to justify their work on behalf of an estate. *Evangeline*, 890 F.2d at 1326.[4] The Fifth Circuit instructs that "[t]he job of the bankruptcy courts is to oversee trustees' marshalling of a debtor's assets for appropriate distribution among the creditors." *Kipp Flores Architects, L.L.C. v. Mid-Continent Cas. Co.*, 852 F.3d 405, 410 (5th Cir. 2017) (citation omitted). Professional fees are thus subject to the Bankruptcy Court's discretion and reviewed on appeal by this Court and the Court of Appeals. *See In re Woerner*, 783 F.3d 266, 272 (5th Cir. 2015) (en banc). The courts "should only award fees *to the level* that has been proven to be actual, necessary and reasonable." *Evangeline*, 890 F.2d at 1327.

---

[4] In a separate context, this Court has discussed the particular care the judiciary must take when appointing officers of the court. *See S.E.C. v. Adams*, No. 3:18-CV-252-CWR-FKB, 2018 WL 2465763, at *1-2 (S.D. Miss. June 1, 2018).

This case was always at risk of a supercharged conflict. First, there's real money on the table. Relative to the Mississippi legal economy, there's an enormous estate to bill here. Second, the minority creditors have so little at stake, in real terms and relatively, that they have no incentive to step in. A fight between the Trustee and Dr. Edwards won't meaningfully impair their collective 0.1% recovery. The final, and maybe critical psychological realization here, is that when a Trustee lodges colorable accusations of impropriety against the super-majority creditor,[5] she renders less persuasive that creditor's objection that the Trustee is wasting estate assets.

Adding dollar signs might help make the hypothetical less abstract. Say the Estate of CHFS is ultimately worth $20 million. (Dr. Edwards claims he's owed $30 million, but this is bankruptcy; he won't walk away with 100% of his claim.) Then the professionals need to be paid—*someone* had to step in and take care of CHFS when its owner fled to Central America and then went to federal prison—and maybe their bills reach $2 million. We are left with $18 million for creditors. Less than 0.1% goes to the minority creditors, while Dr. Edwards exits from Bankruptcy Court with about $17,982,000. (Keep in mind he also has to pay his team of attorneys, so he goes home with meaningfully less than that.)

To be clear, that is a hypothetical about how it should have worked. Protect the assets, subtract necessary professional fees, and distribute the corpus to the creditors.

In real life, however, the Trustee, her counsel, and the professionals they retained have defined "necessary" work so broadly that they have billed the Estate more than $5 million. Docket No. 41 at 8 & n.15. More than 30 attorneys at Jones Walker have billed the file. *Id.* at 5 & n.8. The firm even billed for law student intern work. *Id.*

---

[5] Having ownership of more than 99% of the estate, Dr. Edwards is actually a "super-duper" creditor. It's a legal term of art. *See* Orin S. Kerr, *A Theory of Law*, 16 Green Bag 2d 111 (2012).

Aspects of the firm's work verge on the untenable. The Trustee hired an expert in the commercial law of the British Virgin Islands and Bermuda to testify live at trial that the inclusion of the word "The"[6] in some of the parties' documents invalidated millions of dollars of secured transactions over many years. This in turn forced Dr. Edwards to hire his own, competing expert about the meaning of the word "The" in those jurisdictions. The Bankruptcy Court's opinion dedicated 11 pages to the evidence and foreign law on this issue before concluding that it was immaterial because Dr. Edwards and CHFS knew who they were dealing with and weren't confused. Op. at 108-18. Charles Dickens would be impressed. *See* Bleak House (1852-1853).[7]

In law, the billable hours can keep going as long as there is a target to fight. There's a great target here: a stubborn and wealthy doctor-playing-businessman from out-of-state.[8] And in this situation the Trustee has no financial incentive to stop billing hours, as she is essentially using Dr. Edwards' own money to sue him. Her fees and those of her law firm are being siphoned from the creditors' eventual recovery.[9] One cannot overlook or lose sight of that fact. Unfortunately, the present Bankruptcy Judge has not placed any meaningful checks on the Trustee's billing.

---

[6] That pesky three-letter word is probably the most commonly used word in English. "The" is "omnipresent; we can't imagine English without it. But it's not much to look at. It isn't descriptive, evocative or inspiring. Technically, it's meaningless. . . . [But it] could be one of the most potent [words] in the English language." Hélène Schumacher, *Is this the most powerful word in the English language?*, BBC, June 26, 2020, https://www.bbc.com/culture/article/20200109-is-this-the-most-powerful-word-in-the-english-language, Here, the colossal waste of resources expended to have the Bankruptcy Court reach this commonsense conclusion defy logic.

[7] If John Grisham wants to write *The Trustee*, this case would provide great research material.

[8] In retrospect, it may have been better for this case to have proceeded in Maryland. A forum selection clause in the parties' original contract requires all disputes to be litigated there. *See* Docket No. 2-7 at 18-19 in No. 3:13-CV-587; *see also In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299, 306 (5th Cir. 2013). Although CHFS was based in Mississippi and Mississippi-based companies generally go through bankruptcy in the U.S. Bankruptcy Court for the Northern or Southern District of Mississippi, the parties' dispute kicked off in state court months before CHFS declared bankruptcy. The parties each overlooked or agreed to avoid this provision of the contract. Had it been brought to the attention of the Court, though, the undersigned likely would have dispatched this case to Maryland. *See BK Tax Serv. v. Jackson Hewitt, Inc.*, No. 3:12-CV-676-CWR-FKB, 2013 WL 3821758, at *4 (S.D. Miss. July 23, 2013).

[9] Dr. Edwards is in fact paying twice, as he is financing both his antagonists at Jones Walker and his own defense lawyers at Watkins & Eager.

Dr. Edwards has objected to the Trustee's fees. It was in October 2014 that he emailed the Trustee's counsel saying, "please exit the loan servicing business as we cannot abide by your firm's [Jones Walker's] charges." Op. at 72. The email is worth quoting in full. It said:

> Jeff,
>
> Martha forwarded your question on the Sanford mortgage release. Please refer any person looking for a mortgage release from a loan owned by EFP or BHT directly to me. I will research it and try to resolve their issues as I have done for many mortgages in the past.
>
> Jeff, please exit the loan servicing business as we cannot abide by your firm's charges. Let Vantium deal with CHFS loose ends; Martha and I will deal with EFP and BHT loan loose ends.
>
> I was astounded by the magnitude of Jones-Walker fees so far in this case. They were out of proportion to anything I have seen before. As you know, 99.9% of your fees will be eventually taken from me and my family.
>
> Please turn your attention to resolving the merit-less adversary proceedings. They were just thrown up as road blocks to our recovery. If you require any more documentation to establish the validity of our claims or ownership of our loans, let me know and I will provide it. We need to bring this to an end and not drag it out. Please help.
>
> Charles

PX-44 in No. 3:18-CV-156. Dr. Edwards has made this plea for six years now.

The Trustee has attempted to neutralize his objections by making counter-accusations of his own impropriety. Her allegations make Dr. Edwards look like he's trying to evade the scrutiny of an independent officer of the court. His grievances become 'sour grapes,' so skepticism becomes understandable. But what if he just wants his money back?

This Court has raised these concerns with the parties numerous times. The most recent expression of worry came in the Court's order directing supplemental briefing. The Trustee's response persuasively showed that overbilling concerns are presently not before the Court. Dr. Edwards' request for the undersigned to take them up today by withdrawing the reference is not

well-taken and will be denied. It is not appropriate to try and find that point where reasonable management became unreasonable litigiousness.

Some plain talk is nevertheless warranted. Dr. Edwards should know that the Trustee and Jones Walker will be paid a substantial, seven-figure sum of money for their efforts on this case. They did necessary, complicated, and valuable work to recover assets, unwind fraud, manage CHFS, and bring stability to the consumers who relied upon CHFS for mortgage servicing. Meanwhile, the Trustee and Jones Walker should know that, from this vantage point, $5 million is excessive. The Fifth Circuit has discouraged bankruptcy proceedings where "courts' workload would increase substantially without yielding any benefit whatsoever to the debtor or the debtor's estate." *Kipp Flores*, 852 F.3d at 413. Yet that is our situation. The record raises red flags about whether the Trustee and her firm are acting "as prudent fiduciaries, seeking to preserve property of the estate for the benefit *of their creditors*." *In re MD Promenade, Inc.*, No. 08-34113-SGJ-7, 2009 WL 80203, at *13 (Bankr. N.D. Tex. Jan. 8, 2009) (emphasis added).

The parties do not wish to compromise. That is their right. The judiciary will do what is required. The second and present Bankruptcy Judge on this case moved with impressive speed to wrap this matter up within 13 months of receiving the case. This Court, while not nearly as fast, has endeavored to come to the outcome required by the evidence and the law. The Fifth Circuit will do the same.

Once again, though, the Court pleads with the parties to resolve this situation lest this case go down in history as the Southern District of Mississippi's modern-day *Jarndyce v Jarndyce*.

8

## II.    Standard of Review

The legal standard in a bankruptcy appeal is well-established.

A district court, in reviewing the findings of a bankruptcy court, acts in an appellate capacity. . . . Conclusions of law are reviewed *de novo*. A finding of fact, however, may be disregarded only if it is clearly erroneous. The bankruptcy judge's opportunity to make first-hand credibility determinations entitles its assessment of the evidence to deference by both the district court and this court alike. Neither may weigh the evidence anew. Rather, we must determine whether the evidence supports the bankruptcy court's findings and set them aside only if we are left with the definite and firm conviction that a mistake has been committed.

*In re Perry*, 345 F.3d 303, 308–09 (5th Cir. 2003) (quotation marks and citations omitted).

"Issues of statutory interpretation are reviewed *de novo*." *Matter of Glenn*, 900 F.3d 187, 189

(5th Cir. 2018) (citation omitted).

The Supreme Court has explained that "an abuse-of-discretion standard does not mean a

mistake of law is beyond appellate correction. A [trial] court by definition abuses its discretion

when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996) (citations

omitted). "The abuse-of-discretion standard includes review to determine that the discretion was

not guided by erroneous legal conclusions." *Id.*

## III.    Is Dr. Edwards a Secured Creditor as to the Home Improvement Line Loans?

Dr. Edwards' first deal with CHFS, the "Home Improvement Line" loans, commenced in

2006. Here's how it worked:

In two contracts, a Dr. Edwards company named (The) Rainbow Group agreed to make

$10 million available to CHFS. CHFS drew down the funds to buy consumer mortgages that

people had taken out to improve their homes—thus the name, "Home Improvement Line." CHFS

serviced the mortgages and sent Rainbow the interest it owed. Rainbow took a security interest in

CHFS's receivables. CHFS, meanwhile, delivered the original consumer mortgages to

Mississippi attorney Hal McCarley, who served as Custodian. A separate Custodial Agreement provided that McCarley held the originals as collateral for Rainbow's benefit.

More than 1,800 home improvement loans were handled through this arrangement. Between $600,000 and $700,000 flowed through this deal each month. Op. at 17.

Dr. Edwards later assigned Rainbow's rights and duties as Lender to Beher Holdings Limited. He could do that under § 9.6 of the parties' first contract, the 2006 "Loan and Security Agreement," which states that Rainbow could divide the loan and assign its rights and duties "AT ANY TIME." Docket No. 4-4 at 38 in No. 3:18-CV-154. When he did so the business relationship was fundamentally unchanged. Dr. Edwards kept the taps open; CHFS bought and serviced mortgages; and McCarley held the original documents as collateral.

Then Dr. Edwards re-assigned and split his investment between two entities: Edwards Family Partnership and Beher Holdings Trust, the present appellants. This was again explicitly permitted by the contract. Once again each aspect of the relationship operated as before.

The end result was a $4 million note between CHFS and EFP, and a $12 million note between CHFS and BHT. It is undisputed that when CHFS declared bankruptcy, it owed Dr. Edwards' entities $17.8 million on these notes.

### A.      Were the "Intra-Edwards" Assignments Valid?

In Count II of this Adversary Proceeding, the Trustee argued that Dr. Edwards' internal assignment of the note(s), from Rainbow to BHL to EFP/BHT, was invalid. The Bankruptcy Court found that she was proceeding on this theory under 11 U.S.C. § 544. Op. at 101. State substantive law therefore governs whether she has standing to complain about these assignments. *In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010). Standing is reviewed *de novo*. *Moore v. Bryant*, 853 F.3d 245, 248 (5th Cir. 2017).

Under Mississippi law, "a borrower not a party to the assignment of one's security interest has no standing to challenge the assignment of that interest." *Crater v. Bank of N.Y. Mellon*, 203 So. 3d 16, 19 (Miss. Ct. App. 2016) (citation omitted). The Trustee is not a party to Dr. Edwards' assignments of his security interest. It follows that she lacks standing to challenge the validity of any assignment of that interest. *Accord In re Cook*, 457 F.3d 561, 567 (6th Cir. 2006) (finding that bankruptcy trustee proceeding under § 544 did not have standing under Kentucky law to challenge the assignment of a perfected security interest). Whether the Trustee may have standing under other authorities is not before the Court.

The Bankruptcy Court nevertheless found that the Trustee had standing because her claim "would render the 2010 Assignment void." Op. at 121. Its best authority for that proposition came from the Fifth Circuit's interpretation of Texas law, rather than Mississippi law. *See id.* (citing *Reinagel v. Deutsche Bank Nat. Tr. Co.*, 735 F.3d 220, 225 (5th Cir. 2013)). The *Reinagel* court held that while "an obligor cannot defend against an assignee's efforts to enforce the obligation on a ground that merely renders the assignment voidable at the election of the assignor, Texas courts follow the majority rule that the obligor *may* defend on any ground which renders the assignment void." 735 F.3d at 225 (quotation marks and citations omitted).

There are good reasons to adopt this conclusion. First, simple odds make it more likely than not that Mississippi would follow the majority rule. Second, Mississippi has "liberal standing requirements." *SASS Muni-V, LLC v. DeSoto Cty.*, 170 So. 3d 441, 449 (Miss. 2015). The Mississippi Supreme Court once found, for example, that a tax-sale purchaser had standing to argue that the Chancery Clerk's improper procedure rendered the sale void. *Id.* (applying Miss. Code Ann. § 27-43-3). Third, an investigation into the few local decisions to have considered and rejected this conclusion reveals that they discuss standing alongside the merits of

11

assignments in the context of securitization. *E.g.*, *Anderson v. Wells Fargo Bank, NA*, No. 2:15-CV-88-KS-MTP, 2016 WL 1562940, at *1 (S.D. Miss. Apr. 18, 2016). We are not in the securitization world.

When a state's highest court has not ruled on an issue, a federal court must "defer to intermediate state appellate court decisions unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002) (quotation marks and citation omitted). This Court is not so persuaded as to reject the Mississippi Court of Appeals' decision, and therefore defers to its holding in *Crater v. Bank of New York Mellon*.

*Crater* was quoted above, but will now be explained in more detail.

Brenda Crater filed suit in state court alleging that Bank of New York Mellon was wrongfully foreclosing on her home. 203 So. 3d at 18. Mellon wasn't the original lender. It had come to hold the deed of trust by assignment. *Id.* Crater sought to halt the foreclosure by proving that "the assignment of the deed of trust to Mellon without the assignment of the associated promissory note was null and *void*." *Id.* (emphasis added); *see also id.* at 19.

The Mississippi Court of Appeals didn't review the authorities regarding standing to pursue claims that are void as opposed to voidable. Its entire analysis was the following:

> Crater asserts (1) that she has standing to challenge the assignment from MERS to Mellon as void, and (2) that assigning the deed of trust to Mellon, without also assigning the promissory note, makes the assignment void. With regard to Crater's standing to challenge the assignment, we find she has no standing because she was not a party to that transaction, as a borrower not a party to the assignment of one's security interest has no standing to challenge the assignment of that interest. *Neel v. Fannie Mae*, No. 1:12cv311–HSO–RHW, 2014 WL 977328, at *3 (S.D. Miss. Mar. 12, 2014).

203 So. 3d at 19; *see also Neel v. Fannie Mae*, No. 1:12-CV-311-HSO-RHW, 2014 WL 896754, at *4 (S.D. Miss. Mar. 6, 2014). In other words, in Mississippi, plaintiffs lack standing to

challenge an assignment exclusively between other parties, regardless of whether the assignment is void or merely voidable.

Per *Crater*, the Trustee lacks standing to proceed on this count.

Should the Fifth Circuit disagree, though, what follows will explain the undersigned's concerns about the Bankruptcy Court's next steps.

After finding standing, the Bankruptcy Court conducted a lengthy analysis into the merits of whether the law of the British Virgin Islands rendered Dr. Edwards' assignment void. That analysis failed to support the Trustee's claim; the restoration of Dr. Edwards' entities under BVI law rendered the assignment retroactively *valid*. But the Bankruptcy Court did not stop there. Instead, it pivoted and asked a novel question: whether the law of the British Virgin Islands "should be disregarded as conflicting with federal bankruptcy law." Op. at 127.

The Bankruptcy Court then concluded that it would be unfair to honor Dr. Edwards' assignment as retroactively valid because, during the years of his entities' nonconformity with BVI law, his entities had filed proofs of claim in this Bankruptcy Court matter. The Bankruptcy Court found that the proofs of claim were invalid and could not be ratified—could not be cured—by Dr. Edwards' present corporate compliance. It would be *unfair to the other creditors*, the Bankruptcy Court reasoned. *Id.* at 128-29.

Unfair to the other creditors? No way. The other creditors have waited *years* for meager payments while the Trustee spends *estate* money to prioritize *her* administrative fees above their and every other creditor's recovery. No, that justification is simply incredible.

But set that aside for a moment. It was an abuse of discretion to even consider ratification.

"It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996) (quotation marks and citation omitted); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007). The Trustee's ratification theory was never raised in the pleadings or the Pretrial Order. *See* Docket No. 4-2 at 50-51 in No. 3:18-CV-154. It follows that it was waived.

The Bankruptcy Court's memorandum opinion asserted, without authority, that it could consider the Trustee's ratification theory at the eleventh hour because Dr. Edwards had given late notice of the BVI restoration. Op. at 127 n.45. That's a kind of "two wrongs make a right" reasoning unsupported by the timeline or the law.

Dr. Edwards' evidence of restoration came at the tail end of the litigation, true enough, but it was timely enough to be included in the Pretrial Order. Dr. Edwards notified the Trustee of the BVI restoration on August 4, five days *before* the parties submitted their proposed Joint Pretrial Order. *Id.* at 95. The Pretrial Order wasn't entered until September 5. *Id.* at 6. It was amended once on September 18 and again on October 24. *Id.* Dr. Edwards' update was in.

In contrast, the Trustee's ratification theory was not included in any of the Pretrial Orders. She knew about Dr. Edwards' restoration before she submitted the proposed Joint Pretrial Order on August 9. She then had more than seven weeks to get her claim in the second amended Pretrial Order. She also could have filed a motion seeking its untimely inclusion. She did none of those things.

The ratification theory's absence from the last Pretrial Order means it was too late to advance it from the well of the courtroom at trial. *See* Docket No. 4-2 at 830 in No. 3:18-CV-154. Dr. Edwards had no reasonable notice of or opportunity to defend against it.

14

To all this, the Trustee would likely contend that the Bankruptcy Court's late consideration is within the standard of review. Courts review "decisions regarding amendment of pretrial orders for abuse of discretion." *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010) (citation omitted).

She would probably be correct if the Bankruptcy Court had considered the elements of the proper legal standard—the four-factor test courts must apply in this Circuit when considering untimely additions to Pretrial Orders. *See, e.g.*, *id.* The Bankruptcy Court did not do that. *Compare id. with* Op. at 127 n.45.

"Because . . . a court by definition abuses its discretion when it applies an incorrect legal standard, we review such errors de novo." *Benavides v. Chicago Title Ins. Co.*, 636 F.3d 699, 701 (5th Cir. 2011) (citation omitted); *see also Koon*, 518 U.S. at 100 (1996) ("A [trial] court by definition abuses its discretion when it makes an error of law.").

Reviewing the timeline of this issue *de novo*, the undersigned finds that the Trustee's delay in raising ratification waived that claim, consistent with the usual standard in this Circuit. *See McGehee*, 101 F.3d at 1080.

The Trustee's challenge to Dr. Edwards' internal assignment is reversed and rendered.

**B.      Did the Custodial Agreement Need to be Assigned?**

The parties agree that the 2006 contracts resulted in a security interest. In Count IV of this Adversary Proceeding, the Trustee argued that Dr. Edwards lost his security interest in the HIL loans when he failed to assign the Custodial Agreement to his new lender, BHL. The Bankruptcy Court agreed. The Trustee has standing to pursue this line of attack because CHFS was a party to the Custodial Agreement.

Under Mississippi law, "[t]he primary purpose of all contract construction principles and methods is to determine and record the intent of the contracting parties." *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (Miss. 2003) (citation omitted). "A cardinal rule of construction of a contract is to ascertain the mutual intentions of the parties." *Union Planters Bank, Nat'l Ass'n v. Rogers*, 912 So. 2d 116, 120 (Miss. 2005) (citation omitted).

The analysis begins and often ends with the plain language of the contract, since the words the parties selected "are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Royer Homes*, 857 So. 2d at 752 (citation omitted). The contract is read "as a whole, so as to give effect to all of its clauses." *Id.* (citation omitted).

"[I]f the contract is unclear or ambiguous, the court should attempt to harmonize the provisions in accord with the parties' apparent intent." *Id.* (quotation marks and citation omitted).

Section 9.6 of the 2006 Loan and Security Agreement says Rainbow could divide the loan and assign its rights and duties "AT ANY TIME." Docket No. 4-4 at 38 in No. 3:18-CV-154. This gave Dr. Edwards unilateral power of assignment. He invoked this clause when he assigned the rights and responsibilities of Lender from Rainbow to his other entities.

Section 5.7 of the Custodial Agreement, meanwhile, prohibits assignment or transfer of the Custodial Agreement without written consent of the parties. *See* Docket No. 4-4 at 202 in No. 3:18-CV-154. This is not inconsistent with § 9.6 of the Loan and Security Agreement. Read together, as Mississippi law requires, § 5.7 of the Custodial Agreement simply means that everyone would have to agree in writing before they could change *the custodian* of the mortgages. The lender can change at any time. The custodian can't.

In any event, it was clear error to hold Dr. Edwards responsible for a failure to assign the Custodial Agreement. As the Trustee's own brief observes, neither Dr. Edwards nor any of his

16

entities actually signed the Custodial Agreement. Docket No. 25 at 19. To the extent assignment was required (it wasn't), it wasn't required to be done by Dr. Edwards.

The structure of this deal is reasonable enough. The Loan and Security Agreement reflects an agreement between lender and borrower. The lender agreed to make money available to the borrower in exchange for a rate of return. The Custodial Agreement reflects an agreement between borrower and custodian. The custodian agreed to hold the consumer mortgages for the lender's benefit in exchange for a fee.

The evidence introduced at trial confirmed that the arrangement worked. It worked in 2006 and kept working through every change in Lender.[10] And the Custodian confirmed that he was never confused about who the lender was. He "took instruction from Dr. Edwards as to the identity of the lender." Op. at 137.

Now for the law. Mississippi Code § 75-9-313(c)(1)-(2) says that a person possessing collateral for a lender's benefit gives the lender a perfected security interest. McCarley's possession of consumer mortgages for Rainbow gave Rainbow a perfected security interest. Everyone agrees on this part.

Mississippi Code § 75-9-310(c), in turn, says "[i]f a secured party assigns a perfected security interest or agricultural lien, a filing under this article is not required to continue the perfected status of the security interest against creditors of and transferees from the original debtor." That means Dr. Edwards didn't have to "re-perfect" the security interest upon assignment.

---

[10] For what it's worth, the record confirms that CHFS knew and consented to Dr. Edwards' still-perfected security interest upon assignment. On August 10, 2010, Dickson and Dr. Edwards signed an "Amendment" to the "CHFS Loan and *Security Agreement*" (emphasis added) updating the terms of the loan to reflect that the new lenders would be Beher Holdings Trust and Edwards Family Partnership.

The Bankruptcy Court disagreed with this last conclusion. It found that the parties "varied by agreement" the continuous-perfection provision of § 75-9-310(c), in that the parties had affirmatively required Dr. Edwards to re-perfect his security interest every time he assigned the note to a new entity. Op. at 138. The Bankruptcy Court based this conclusion off of § 5.7 of the Custodial Agreement. But the plain language of § 5.7 doesn't say that the parties were waiving § 75-9-310(c) or that re-perfection was required upon assignment. And even if it did say that, it would be irrelevant since Dr. Edwards didn't sign the Custodial Agreement.

The Trustee embarked upon a long, tortured journey to try and convert Dr. Edwards to an unsecured creditor. The simplest path through the law and the evidence does not support such a conclusion. This Court sees a secured interest in 2006 and the assignment of that secured interest. Dr. Edwards is a secured creditor on the HIL loans. The Bankruptcy Court's findings to the contrary disregard the contract and the law. They are vacated and remanded. The cash collateral issues are necessarily remanded as well.

## IV.    Were the Mortgage Portfolios Joint Ventures?

The next set of issues concerns the mortgage portfolios between CHFS and the Edwards entities. The Bankruptcy Court evaluated the evidence and declared the mortgage portfolios to be loans. The Edwards entities seek to have them declared joint ventures.

The standard of review says trial court factual findings are owed substantial deference. Pursuant to that standard, and notwithstanding how parts of today's opinion might look, in prior cases this Court has usually affirmed the Bankruptcy Court's findings and decisions.

In other sections of today's ruling, this Court has found certain factual findings clearly erroneous only because the evidence in Dr. Edwards' favor was so overwhelming that the finding could not be sustained. The Bankruptcy Court's decisions on the mortgage portfolios are

18

different. Although this Court might have evaluated them differently as the trier of fact, that is not the standard on appeal. The Bankruptcy Court's rulings on the mortgage portfolios are within the standard of review and affirmed.

## V.     Post-Petition Conduct

### A.     Did Dr. Edwards Violate the Automatic Stay?

Dr. Edwards contests the Bankruptcy Court's finding that he violated the automatic stay pursuant to 11 U.S.C. § 362(k). He argues that he was searching for Dickson's Costa Rican assets rather than CHFS's assets, that he was held responsible for mere possession of CDs, and that the CDs were duplicative of existing information.

The Bankruptcy Court's discussion was not as limited as Dr. Edwards' brief claims. The Bankruptcy Court emphasized Dr. Edwards' global actions and attempts to secure information rather than the ultimate (f)utility of the information he gleaned. Op. at 187-96.

This broad scope of review makes sense. That Dr. Edwards may have been reacting to the breakdown in trust between himself and the Trustee does not automatically mean a reviewing court should give him a pass and decline to look at whether he violated a court order. Just as we should not condone a Trustee perceived to be taking advantage of an estate, we should not condone a creditor perceived to be circumventing a court order or a Trustee.

Nor should we yield to Dr. Edwards' current arguments about the relevance of the information. "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *In re Bradley*, 588 F.3d 254, 265 (5th Cir. 2009) (citation omitted). So this Court

agrees with the breadth of the Bankruptcy Court's review and the Trustee's arguments on appeal supporting that broad analysis.

That said, there were other, discrete legal and factual errors in this part of the Bankruptcy Court's memorandum opinion and judgment.[11]

We begin with standing. The Bankruptcy Court sidestepped the question of the Trustee's standing under § 362(k) to pursue damages for an automatic stay violation. It quoted Collier's and other authorities for the proposition that "section 362(k) provides a remedy only for natural persons," Op. at 195, which if true would end this claim in Dr. Edwards' favor. The Bankruptcy Court, however, then found such an analysis "unnecessary" because the court could sanction Dr. Edwards under its contempt power. *See* 11 U.S.C. § 105.

The Edwards entities argue that was error because "the standard for awarding damages for contempt is <u>much</u> different – and much higher than – the standard for awarding damages under § 362(k)." Docket No. 23 at 81. They claim support from an Eastern District of New York case allegedly imposing a "maliciousness" standard. *Id.*

The evidentiary standards are indeed different. "In order to prove a violation of § 362(k), a plaintiff must establish by a preponderance of the evidence that: (1) the defendant knew of the existence of the stay; (2) the defendant's actions were taken intentionally; and (3) those actions constituted stay violations." *St. Paul Fire & Marine Ins. Co. v. Labuzan*, No. CIVA H-05-3811, 2010 WL 1065958, at *2 (S.D. Tex. Mar. 22, 2010) (quotation marks, citations, and brackets omitted). In contrast, the civil contempt standard requires "clear and convincing evidence that:

---

[11] The justification for investigating a violation of the automatic stay is fairly weak in this case. The automatic stay exists "to protect the debtor's assets, provide temporary relief from creditors, and further equity of distribution among the creditors by forestalling a race to the courthouse." *GATX Aircraft Corp. v. M/V Courtney Leigh*, 768 F.2d 711, 716 (5th Cir. 1985). Here, though, Dr. Edwards owns 99.9% of the estate's assets. There's no race to the courthouse because no one else has a real interest in this case. Nevertheless the automatic stay obviously exists and had to be honored.

(1) a court order was in effect; (2) the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the order."[12] *MD Promenade*, 2009 WL 80203, at *14 (citations omitted).

The standards for assessing damages, while overlapping, also have different characters. "Section 362(k) provides in relevant part that an individual injured by any willful violation of the automatic stay shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *In re Terry*, No. 18-44642-ELM-13, 2019 WL 7169095, at *12 (Bankr. N.D. Tex. Dec. 23, 2019) (quotation marks, citation, and brackets omitted). Civil contempt damages are designed to achieve ends beyond actual damages, though, and therefore require a different approach.

> Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.
>
> But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.

*United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947) (citations omitted). The Fifth Circuit's leading case on contempt emphasizes that the trial court "has broad discretion in the assessment of damages in a civil contempt proceeding. The purpose is to compensate for the damages sustained. The public rights that the said court orders sought to protect are important measures of the remedy." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (quotation marks and citations omitted); *see also Bradley*, 588 F.3d at 263.

---

[12] This standard contains no malice requirement.

"A bankruptcy court's assessment of monetary sanctions for contempt is reviewed for abuse of discretion. A court abuses its discretion if it awards sanctions based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *In re Lothian Oil, Inc.*, 531 F. App'x 428, 445 (5th Cir. 2013) (quotation marks and citations omitted).

Several bankruptcy courts have considered § 362(k) and § 105 arguments in the same order. *E.g.*, *In re Reed*, 616 B.R. 77, 82 (Bankr. N.D. Miss. 2020). This very Bankruptcy Court has done that before, too. *See In re Adams*, 516 B.R. 361, 368-69 (Bankr. S.D. Miss. 2014). That unfortunately did not happen here.

The Bankruptcy Court's memorandum opinion uses the word "contempt" on two of its 214 pages, but otherwise exclusively applies the § 362(k) standard. Pages 189 to 194 invoke and apply the elements of a § 362(k) violation. Pages 194 to 196 invoke and apply the standard for imposing damages under § 362(k). The section concludes with a finding that the Trustee "is entitled to a judgment against Dr. Edwards and EFP/BHT in the total amount of $71,458.25 pursuant to § 362(k)." Op. at 196. The entire opinion concludes with the same recitation. *Id.* at 213. And page six of the final judgment explicitly rests the findings on "11 U.S.C. § 362(k)," rather than 11 U.S.C. § 105.

If the Bankruptcy Court's decision concluded with a mistaken citation to § 362(k) we might have a harmless clerical error. Yet a review of the entire record leaves this Court with the definite and firm conviction that the Bankruptcy Court applied § 362(k), a statute which might not provide a remedy, in lieu of applying § 105. The issue must therefore be remanded for either an explanation of why the Trustee has standing to pursue damages under § 362(k) *or* an analysis explicitly grounding liability and damages in § 105's contempt authority.

In case the Fifth Circuit disagrees with this conclusion and finds the existing discussion a legally-sufficient contempt finding pursuant to § 105, however, this Court will move on to the factual errors in this part of the Bankruptcy Court's findings.

The record does not bear out the Bankruptcy Court's finding that the information Dr. Edwards obtained was "from CHFS's computers." Op. at 191. Testimony revealed that the information was "from the personal computer of Reshonda Rhodes." Docket No. 4-2 at 370 in No. 3:18-CV-156.

The record then does not bear out the Bankruptcy Court's specific award of $10,000 in damages for "additional servicing costs." Op. at 196.

Damages must be established "with reasonable certainty," rather than evidence that is "speculative or based on conjecture." *Adams*, 516 B.R. at 370. When asked to prove her damages at trial, though, the Trustee said "[i]t's almost like proving a negative in some situations." Docket No. 4-2 at 255 in No. 3:18-CV-156. That is plainly not enough. The Trustee then tried to make a causal connection between her claim that (a) new information was contained on the CDs, and (b) higher servicing costs she says the Estate incurred. Yet there are evidentiary hurdles with each of those elements.

Regarding (a), an email exchange with the Trustee's attorney "laid to rest" whether there was new information contained on the CDs. Op. at 193. The Bankruptcy Court proceeded to ascribe error to Dr. Edwards for not turning over the original CDs, but that was flipping the burden of proof. The email with Trustee's counsel already established the lack of a genuine factual dispute.[13]

---

[13] Given the email exchange, the Bankruptcy Court erred in piling on with its finding that Dr. Edwards "continues to violate the automatic stay by refusing to surrender both original CDs referenced in his email of October 15, 2014, to the Trustee." Op. at 194.

Regarding (b), higher servicing costs, the Trustee attempted to prove damages by testifying that she suffered "increased servicing frustrations and walk-arounds and how to put penny to paper on all of that. And it's hard to do that." Docket No. 4-2 at 256 in No. 3:18-CV-156. The Trustee's brief here says this testimony is enough to sustain the award because she "was referring" to her "estimate[]" in the Pretrial Order. Docket No. 25 at 82 & n.114. But the Pretrial Order isn't evidence. And parties don't get a pass on proving damages just because they think it is "hard to do."

The Trustee has spared no expense on experts and professional assistance to advance her claims. Trial was the time for her to generate evidence assigning a dollar figure to any increased "frustrations" she says she incurred. She did not.

Courts are "wholly unable to make an assessment of the propriety of a fee award based on a number alone, devoid of any explanation of the method for its derivation." *Evangeline*, 890 F.2d at 1328. Accordingly, the $10,000 award for additional servicing costs cannot be affirmed.

For these reasons, the Bankruptcy Court's findings under § 362(k) are vacated and remanded. "If it is determined [on remand] that fees should be awarded, the court should clearly explain how it arrived at the level of compensation awarded." *Id.*

B.    **Did Dr. Edwards Convert Estate Property?**

The Bankruptcy Court found that Dr. Edwards converted "estate property" in the form of two CDs he recovered from Costa Rica. Op. at 203-04. The Bankruptcy Court awarded $10,000 in damages on this claim, again for the "additional servicing costs" allegedly incurred by the Trustee. *Id.* at 204.

"The reported cases in Mississippi reflect the view that an action for conversion is available for wrongful interference with tangible items of personal property and those 'intangible

rights that are customarily merged in, or identified with some document.'" Jackson & Miller, 5 Encyclopedia MS Law § 41:89 (2d ed. Oct. 2019 update) (citation omitted); *see also LaBarre v. Gold*, 520 So. 2d 1327, 1330 (Miss. 1987). In contrast, there is no cause of action for conversion of intangible items. *See Directv, Inc. v. Hubbard*, No. 2:03-CV-261-P-D, 2005 WL 1994489, at *4 (N.D. Miss. Aug. 17, 2005) (concluding that allegations of stolen satellite transmissions did not state a conversion claim because digital transmissions "are not 'tangible' in the sense that they can be perceived by the touch of the skin").

The Bankruptcy Court acknowledged this law, then determined that Dr. Edwards converted two CDs. That was clear error. The tangible CDs themselves were never the property of CHFS or the Trustee, and the information contained on them is intangible, subject to unlimited reproduction and access. The Bankruptcy Court cited no authority for the proposition that digital files on a CD are "intangible rights that are customarily merged in, or identified with some document," Jackson & Miller, *supra*, and Mississippi Supreme Court case law discredits the notion.

In *Mossler Acceptance Co. v. Moore*, the State's highest court held that "[c]onversion lies only for personal property which is tangible." 67 So. 2d 868, 873 (Miss. 1953). Although that holding is not recent, Chief Judge Jordan's research found that "[t]he Mississippi Supreme Court has never reversed *Mossler*," *Swift Fin. Corp. v. Bath Planet of Miss., LLC*, No. 3:15-CV-846-DPJ-FKB, 2016 WL 3180291, at *6 (S.D. Miss. June 6, 2016), and the Fifth Circuit has used *Mossler* to emphasize that conversion in this State "is an act of dominion wrongfully exerted over another person's tangible personal property . . . ." *ABS Servs., Inc. v. New York Marine &*

*Gen. Ins. Co.*, 524 F. App'x 946, 951 (5th Cir. 2013) (citing *Mossler*).[14] If "there is no obligation to return identical money," *Mossler*, 67 So. 2d at 873, it follows that there is no obligation to return identical digital files.

In addition, for the reasons discussed above, the $10,000 damages award was not established by any non-speculative evidence. *See Evangeline*, 890 F.2d at 1328.

For these reasons, the Trustee's conversion claim is reversed and rendered.

## VI.   The Trustee's Motion to Lift Stay

Lastly, earlier this year, the Trustee moved to lift this Court's stay. She said she had a deal on the table to sell 3,067 mortgages to an investor. Dr. Edwards opposed the motion, arguing that the purported deal would constitute irreparable harm if he were to prevail on the merits and be declared a secured creditor. He also said that when pressed about the details of the investor's proposal, "the Trustee does not even know which loan portfolios the offer encompasses." Docket No. 32 at 7.

The motion was and is due to be denied as moot. The only evidence attached to the Trustee's motion showed that the offer expired 16 days *before* she moved to lift the stay. *See* Docket No. 30-1. No evidence was presented of the offer's extension. In any event, the Trustee continues to be unharmed by the stay—and in fact profits from the stay—as Dr. Edwards continues to bear 99.9% of the cost of her work during the pendency of this case. Given the merits ruling, unless something significant changes, the undersigned will keep the stay in place.

---

[14] The Chief Judge's review indicated that conversion of an intangible states a claim in Mississippi only when the plaintiff alleges "conversion of a particular, identifiable fund, or funds from a specific-purpose account." *Swift Fin. Corp.*, 2016 WL 3180291, at *6.

**VII.    Conclusion**

The judgment is affirmed in part, reversed in part, rendered in part, and remanded for further proceedings consistent with this opinion. A separate Final Judgment shall issue.

This ruling is stayed pending the parties' anticipated appeal and cross-appeal.

**SO ORDERED**, this the 2nd day of October, 2020.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE